May it please the Court, Counsel. I would like to reserve approximately four minutes for rebuttal, okay? This case is fundamentally about due process. It's about a large corporation denying plaintiffs in a putative class their day in court, their right to have their complaints heard on the merits. We're here because the district court below misapplied, clearly defined law regarding Rule 56D, Rule 15A, and the interpretation of evidence under Rule 56. This occurred because HP abused the discovery process. HP filed this motion for summary judgment against plaintiffs in the middle of a class action proceeding. Discovery was still pending. There were two outstanding orders for the raw data that plaintiffs sought. There was no trial date. At this stage of the case, the question wasn't, are plaintiffs ready for trial, are plaintiffs ready to go in front of a jury? The question was, is this action appropriate for class treatment under Rule 23? According to HP, the primary issue in their motion for summary judgment was whether or not plaintiffs had evidence of damages as to themselves, if they could prove up exact damages at the end of the day. This was despite the fact that HP ignored testimony of its own employees and ignoring admissions of payment problems. And it's interesting because HP's claim that plaintiffs had no proof of damages could only be proved from documents that HP itself had and refused to produce. Okay. So that's a good 90 seconds without interruption, which is sort of a record for us. So if you don't mind, you started, counsel, by saying there's two outstanding orders regarding the raw data. Yes. So I want to – I think this is quite key, but please correct me if I'm wrong. Am I right that one of them went to, I think, the master? Yes. Or maybe it was the magistrate, and said, you have to produce this documentation regarding the raw data. And there was a response to that request for production of documents, but it seemed to me your complaint was, hey, what they've given us is the raw data, and we're not going to produce the raw data.       raw data, and we're not going to produce the raw data. So regarding the two orders, one of the orders dates back to September 2010. That's the magistrate judge regarding request for production 12, which is earlier. The second one, however, flowing from the special master's order, HP had objected and they had provided the reasons they objected. They had also suggested a different way to gather that raw data. Okay. So let's talk first about the first one that went from the – came from the magistrate judge, and that's number 12. Yes. Okay. So my understanding is there was a response to that, as I've just described. But you weren't satisfied with it? That's correct, because – Okay. So just looking at that order, what's the status of the extent to which the district court knew that you thought, you know, you still hadn't received compliance with that court order? I believe that that order had been left un – or rather, HP's conduct following that order had not been re-approached at that time in the case. Okay. So in the summary judgment opposition from your team –  Yes. Were you – were you calling to the judge's attention that you still didn't have the raw data you needed to prove up damages? From the former – from the former order, no. From request for production number 12. No, Your Honor. Okay. So then the next order, if you will, can you walk me through that one? What was the status? The status of that one, the – during the briefing on motion for summary judgment and the extended timeline, the special master had ordered that HP begin producing raw data. The special master found that it was relevant, that it was discoverable under the existing definitions in the case in the third amendment complaint. Okay. So by that time, the existing definitions were the narrower definition of what Omega meant, right? Because that's what the discovery master had ruled. We do contest that. We think that the court's ruling was. I know you contest it, but just bear with me because I want to make sure that I understand. Am I right? That would be the argument, yes. Okay. Is that second order, the one that the discovery master made contingent upon the amendment that was never allowed? That's HP's argument. We believe that it was not actually contingent. We think linking the two was, in fact, a mistake because that order, when the judge says the efficacy of the following statement may hinge on the district court's ruling, it wasn't saying the efficacy of my order. The judge had already ordered production of this evidence, which the judge said is relevant and is discoverable. Rather, what the judge said is the efficacy of the following statement as to what he believed, what plaintiffs believed their final case would look like may hinge on the amended fourth complaint. Right. Because the fourth complaint was the one that you – where you wanted to clarify, hey, we mean to define Omega this broader way. Yes. And that amendment was not permitted. That amendment was not permitted. Thank you. Let me pursue this. I'm finding this – it's unusual for us at this level to get this deep into the weeds in a sole series of discovery disputes. And I'm a little puzzled as to how it ends up with us so deep into discovery disputes, but nonetheless, here we are. What outstanding discovery requests did you have with respect to raw data that would have been relevant to any failure to pay properly as to the four named plaintiffs? That goes back to RFP 12 and the order that was just discussed. Right. In the early stages of the case, HP provided its initial disclosures, which stated that documents evidencing plaintiffs' participation in sales, purchases, shipments of HP products and services were relevant. That's under the very early definitions of the case that HP contends are very narrow. Plaintiffs in February requested that – those documents in RFP 12. HP objected. Plaintiffs filed a motion to compel. In September, that was ordered. The discovery disputes continued in such a mess that a special master had to be appointed. And when this motion for summary judgment was filed, HP's court contention and the court – the district court below agreed with that contention in the brief. It's said over and over again. Plaintiffs cannot provide evidence that they were not specifically paid. Of course, our contention is we should have been provided that evidence. But we asked for that data yet again, taking into account months and months of discovery where we actually learned more about this underlying Omega system, about how HP pays everybody. It's a very convoluted system. There's no denying that. But the system itself is not an issue here on the appeal. Rather, what we were looking for was that raw data, the sales information, the purchase information, the shipment information, the order information, the invoice information. Okay. But I want to make sure I keep this question narrow. I'm interested only in what requests you had outstanding that you think should have been fulfilled with respect to data relevant not to the overall system, but specifically to the compensation owed to the named plaintiffs. I believe RFP 12 and then the later request for production. I don't have the numbers in front of me. I don't want to misspeak. I believe it was. And did you say to Judge Breyer, listen, we've got discovery requests out specific to these four plaintiffs that have not been fulfilled, and we're thinking we're going to get information that will be relevant to the determination? Our argument to Judge Breyer was that the discovery master has ordered these things to be produced. We need them to prove up damages. So, yes. Counsel, this is really important, because I understood you earlier. I think you're answering Judge Fletcher's question slightly differently than you answered mine. That usually means that I haven't answered my – asked mine very clearly, I'm afraid. But I thought that I asked you whether in response to the summary judgment motion you told the district court, hey, they haven't complied with this discovery order, it wasn't a request, it was an order, pursuant to RFP 12. Did I hear you wrong? No. With response to RFP 12, the earlier, where the judge had ordered production in September of 2010, that specific argument was not made to Judge Breyer. It was the special master's order that said, hey, this discovery is supposed to be produced, we need time to get this discovery to look at it, et cetera. You didn't tell Judge Breyer? With regard to RFP 12, no. But you did with respect to Judge Warren's order? Yes. Okay.  Thank you. Yes. And so as we stated, HP objected both to the prior or failed to comply with the prior order and objected to the September order. And what they ended up giving plaintiffs were credited transaction reports. It's the – this is information of what we actually paid. It's the output, what spit through Omega. What we saw was the input. Because without that information, how can we say what ought to have been paid? And fundamentally, that's what this comes down to. When did you get that? I understand you thought it was inadequate. This is the raw data that you did receive. When did you get it? We received that earlier in the case, credited transaction reports. HP actually provided that in response to RFP 12. Yes, counsel. And my question is when? I don't have the exact date again. I believe it's going to be between February and September. Okay. Thank you. But your argument is that that data is useless because that merely tells us that HP paid this amount. Exactly. But it would be the data. You have to get it and sift through it before you realize what's missing. Right. Yes. I shouldn't say useless. Right. Correct, yes. We would need the – we would need column A versus column B. If they line up, then we would have to deal with that. But if they don't line up, which is what plaintiffs suspected was the case, there would be proof that plaintiffs were not, in fact, paid for this whole column or parts of that column. And you think you knew – forgive me. And you think you knew that by at least September? No. I think that – Well, at least you got it by at least September. The latter information, what was spit out at the end. We never got the information up front. Right. Right. So at least by September, you got what you got by way of raw data, and then there's some period of time where you have to digest it and figure out that there's something missing. That's – All of the data input is – Correct. Okay. Thank you. Okay. So in essence, Judge Breyer went into his ruling knowing that we were requesting additional information, knowing that the discovery master had found that information was explicitly relevant, was explicitly discoverable under existing definitions of the Third Amendment complaint. With regard to the amended complaint, we feel it was improper for the Court to link the Rule 15a determination with the Rule 56d determination. Under the clear reading of the – under the reading of the complaint and under Rule 15a, Judge Breyer needed to read that complaint in a light favorable to plaintiffs. We do not believe he did so. In his order, Judge Breyer cites from the complaint and discusses Omega System, discusses its accompanying data feeds and software. The definition is – I want to make sure where this argument is going. This is now an argument with respect to the denial of filing the fourth amended complaint?  Okay. And in reading it as narrowly as he did, which we believe was improper, he then ruled that or he then determined that the fourth amended complaint was a vast departure from the third amended complaint. It was not. HP's own testimony reflected in the record was that the plaintiffs would have understood as sales representatives Omega to refer to the entire compensation system. Here's my problem with this, the amended complaint, and I'm not quite sure what to do with it. As I read even the first complaint, and this more or less continues the same way all the way through the third complaint, the complaint talks about the Omega System. It does not specifically say anywhere in the complaint a computer glitch, and it only rarely refers to a computer program. But it appears that in the pretrial order, sort of setting up the discussion, and in one of your briefs to Judge Breyer, you're emphasizing, well, there's a computer glitch. And I understand why you did that, because if the underlying problem is a single computer program or a single computer glitch – and this is how you're casting your argument – that means it's going to be a fairly easy matter to get a certified class. But if the problem is a much broader system, the system about which the would-be amended complaint number four is very explicit, the class action is enormously more problematic. And as I read Judge Breyer's order denying permission to file the Fourth Amendment complaint, he's saying, listen, all along I've been told that this is a narrow complaint aimed at a specific computer glitch or a specific program. And now you're telling me it's much, much broader. I'm not going to allow an amendment to that. So I think what he's saying is, while you wrote a complaint that's potentially broadly read – that is to say, you talked about computer program, the Omega program, or Omega system broadly – I have been misled by you, or at least I've been led to believe by you, that what you're actually saying in the complaint is a computer glitch or a bad computer program rather than some broad system. How do you respond to that? Because I'm rather sympathetic to Judge Breyer on this point. Well, I believe that the understanding of program versus system may have been an issue. A computer system is something more akin to Windows. It has numerous programs scattered throughout it. Computer program is more akin to Minesweeper or Solitaire. It's an individual little program. And as I read Judge Warren's definition, the special master's definition, it does go program, but it doesn't do – I mean, you make up these terms that were baffling to me at the beginning. Judge Warren specifically disavows an ecosystem. That's to say, I guess that's everything in the kitchen sink. Well, and to answer your question, I think the issue is that this whole – this Omega system, this – the issue that led to what plaintiffs believe was inaccurate and untimely payment is incredibly complex. HP knows this. It became very clear to the discovery master. He said it's a mind-boggling system because, quite frankly, it is. In order to try to properly encapsulate that, we needed to get down to a definition. We had two years to try to learn about it, and we tried, and we did our best. And we finally got to a point where we understood it fairly well, which meant that as the complaint or as the pleadings developed, we had to make sure we were accurate to those pleadings. We had to better define Omega. We do believe that even if you call it the whole system, this ecosystem, it is still narrowly Omega because Omega, as plaintiffs understood it, and as HP's employees said, a sales representative would understand it, is broad. So we think that system failed to work. And quite frankly, we – because of that, I mean, whether you call it Omega or whether you define Omega as this long issue, it's still one isolated system, although it's complex. But I'm trying to understand this case now as a practical matter. Assuming that the Fourth Amendment complaint is allowed and assuming now that discovery is allowed with this now quite explicitly broad definition, with a system that is mind-bogglingly complex – I think I'm hearing you say yourself that it is – I think your class action disappears, meaning where is this going if we allow the amendment and another couple of years of discovery on this now explicitly broader definition? We never – we never saw that the Fourth Amendment complaint would lead to this massive expansion of discovery that HP suggested. Rather, we – the amended complaint, the fourth – the language in the Fourth Amendment complaint was put in specifically to deal with the semantic issues that HP kept bringing up. It's like, wait, we want to refer to Omega in this way, yet we're going to disclose information that doesn't fit within HP's own narrow definition of Omega. So we did think it was broader based upon that. So we were attempting to better constrain those issues. Judge Gould has a question. Counsel, I'm sorry. I didn't mean to interrupt you, but I have one rather simple question I wanted to hear the answer to before this passes to your opponent. Did – was there a pre-trial order that specifically said when summary judgment motions could be filed? There was no due date for the summary judgment motions. They brought it without warning to plaintiffs. We knew that they were going to bring it at one point, but there was no, you have to bring it by such and such order. If there's nothing in the pre-trial order that limits it, doesn't Rule 56 by its terms permit a summary judgment motion at any time? It does, Your Honor. And I believe that Rule 56 has a saving in it to a degree. The Rule 56d says that where there is further evidence that plaintiffs have not had the opportunity to discover that is essential to their defense, that the time to respond to that motion for a summary judgment can be extended so that plaintiffs can look at that information and bring it into their defense. And that's why we suggest that Judge Breyer erred when he granted the Rule 56 or when he denied the Rule 56d request. And that issue under 56d, if I'm correct, is reviewed for abuse of discretion, right? It is, Your Honor. Okay. Thank you. Counsel, I am sympathetic to the fact that the discovery master and magistrate, who are a lot closer to this, said it's mind-bogglingly complicated and found a couple of times, I think, that HP had delayed and wouldn't try very hard to comply with your discovery request. But it's – I can't tell from this record that I have whether you took a 30b-6 deposition to say who's most knowledgeable to HP about what this omega system is. What does HP mean when it defines omega? Did you take – so my question is, did you take a 30b-6? There was a 30b-6 deposition, but the understanding of omega came from outside of just that. It came from multiple depositions throughout. There wasn't just one definition where plaintiffs learned about omega, because it – because of the way that discovery was structured in this case and put together. So – Your brief – I think both parties' briefs referenced two depositions taken in, I think, October. September or October. Were those 30b-6 depositions? I believe they were person most knowledgeable. Or I believe – I can't speak knowledgeably. I would like to look back in the record to be able to say that. And that's the first time anybody started talking about an ecosystem or a problem? I believe the phrase ecosystem followed from those, yes. Okay. But your position from early on is that the Fourth Amendment complaint was only verifying what you intended all along, which is a broad definition of omega. Yes, Your Honor. So you didn't think that this was – you were seeking a real expansion of discovery? Correct. Until the discovery master ruled against you and said, no, no, omega is this much smaller universe. Well, not even then, Your Honor. The difficulty with the omega definition is even after those rulings where HP has clearly suggested that it's a very narrow definition, HP was providing more expansive information to the omega request. And the judge was ordering things that HP now says are outside of omega, for instance, the raw data. And plaintiffs were – thus, plaintiffs were led to believe that both the discovery master and HP did understand omega more broadly than I think the term they use is just a calculator. Because even – I mean, the definition of omega throughout talks about tracking cells. It talks about combining information, or HP's discovery talks about combining information inside of omega to go ahead and finally calculate. Omega was understood by plaintiffs, and we assumed by HP, to be something more expansive. Therefore, in providing the definition of the Fourth Amendment complaint, we were attempting to take what we had learned from those depositions to be more precise, but not to expand the case. It was merely to be precise so that the semantic games could stop and that the case could go forward. Okay. But you did have an earlier ruling from a discovery master saying here's the definition of omega that's operative for purposes of discovery, and it was a narrower definition. And I don't think there's an appeal taken of that ruling. I believe you're – I believe you're referring to DML-3. I think I have. And there was no appeal, but we did not understand that to be final. And that is discussed in the briefing. Right. Okay. Thank you. Why don't we hear from the other side, and then we'll give you a chance to respond.  We'll let this argument take whatever time it needs. So. May it please the Court. My name is Peter Buscemi. I'm here on behalf of Appellee Hewlett-Packard. I'll start just by addressing some of the questions that have already been asked. There was a ruling by Magistrate Judge Zimmerman in September of 2010 on a motion to compel with respect to the first set of discovery requests that had been served by plaintiffs in February 2010. And in that ruling, as Judge Breyer points out in his decision, Magistrate Judge Zimmerman made it clear that he was not interpreting discovery requests to extend beyond the alleged malfunction of the Omega software. And he made that clear in several ways. First, he said that he was construing Requests 4 and 5 as inquiring about disputes which involve the malfunction of Omega. He then denied the motion with respect to Requests 7, 14, and 16 because plaintiffs had failed to limit those requests to documents relating to malfunctions with Omega or documents stemming from alleged problems caused by Omega. It is true, as plaintiffs point out, that he granted the motion to compel with respect to Requests 12, but if you read the grant with respect to that request, which was part of a long line of requests, in the context of the rest of his order, which says that he is not granting the motion with respect to requests that extend beyond Omega, you can see that he, too, construed the scope of the case as limited to the Omega software. Now, that wasn't an accident. That wasn't the first time. Go back, when you look at the record further, to the parties' joint case management statement that was filed in January 2010. There, in plaintiffs' own statement of facts, they said that the case was about, quote, a system-wide computer glitch in a system known as Omega. Hewlett-Packard, three days before that was filed, had moved to dismiss and to strike the class allegations. When plaintiffs responded to those motions the next month, February 2010, they repeatedly talked about the system-wide computer failure in Omega, whether HP failed to properly calculate the compensation owed these workers due to the computer glitch. This system-wide glitch is a common problem that affected workers across the company. A clearly defined set of workers used a common system with common problems to track their sales and experienced a common computer failure that miscalculated or failed to calculate. And are you saying that this is a de facto amendment of the complaint? Because the complaint is written more broadly than this argument about glitch. There is no phrase, computer glitch, in any of the complaints. I don't – I'm not disagreeing with you, Your Honor. Sometimes they refer to the computer software. Sometimes they refer to the computer system. But it was clear that they were opposing the motion to dismiss and the motion to strike the class allegations on the ground that they had a common problem that affected everyone, and it was the glitch in the computer software. Right. But here's my problem with how far you want to take that argument. It's entirely consistent with the complaint, it seems to me. And there's language in the briefing in the district court from the plaintiffs that go along this line as to say they're alleging that Omega is a computer system, not merely a computer program, but a computer system that's fairly broad, and that within that system there is a computer glitch, and that the computer glitch is going to give us enough of a common question so that we can get a class action, but that the computer glitch is not the only thing about which they are complaining. I think that's the way the complaint easily could be read. Now, it's possible that in sort of stand-up oral argument in front of Judge Breyer,  But so my question, are you saying that the case management statement in the briefing is a de facto amendment of the complaint? I'm trying to figure out your argument. I think it's an indication of plaintiffs' interpretation of their own complaint. I mean, we can only go on the basis of what plaintiffs and what the court said. If you look at Judge Breyer. But elsewhere it's quite clear that they're interpreting the complaint much more broadly. For example, Judge Warren's order construing or defining the term omega is much broader than computer glitch. Isn't that right? Well, Your Honor, I would say. Is that right? I don't think so, Your Honor. I think that what. No, wait a minute. Judge Warren gives us a definition of omega. And it seems to me that that definition is broader than mere computer glitch. Are you disagreeing with me? Well, I can only read to you what Judge Warren said. Let's look at it. Where is it? It's in the excerpts of record, volume 1. The critical discussion is at pages 80 through 82. And in particular, if you look at the top of page 82, you'll see that the discovery referee says that the referee finds that plaintiffs have alleged that omega refers to a computer program bearing that name and that HP's compensation system is derivatively known as omega. The referee thus rules that plaintiff's use of omega is to a computer program or a system of that name and not to an ecosystem of which omega is merely a part. Now, but you went pretty fast to a computer program or a system of that name. And when he talks about it, when Judge Warren talks about ecosystem, I think he's talking about all the things that might feed into it. That is to say, I don't read Judge Warren's definition. This is what I had in mind when I asked you the question. I don't read his definition as limited to a computer glitch. Well, Your Honor, I don't want to get hung up on the term glitch. He's clearly resolving a dispute between the parties as to whether the case concerns the omega program or the entire compensation system of Hewlett-Packard. If you look at Judge Breyer's opinion, where he quotes from the motion for leave to amend, and you look at the first volume of the excerpts of record, page 4, at the very top of the page, this is the new language that plaintiffs seek to include in the Fourth Amendment complaint. And in that language, they say, omega and omega systems mean the entire commission slash incentive pay compensation system process or processing system used, refined or developed by HP since at least 2004 to calculate, compute or otherwise ascertain commission's incentive pay for HP sales representatives. And then, just so there's no misunderstanding, they go on and they say the terms omega and omega system include but are not limited to all engines, tools, databases, data feeds, data warehouses, indirect seller sources, programmers, servers, software, hardware or systems that feed into, stand behind or relate to the commission incentive pay compensation system. They missed their calling. They should have been writing insurance contracts. But, counsel, if we take a step back, what's wrong with opposing counsel's argument that they were looking to represent a class of people who said they didn't get paid what they were due under whatever, however HP defined their commission system? Your Honor, they have not been able to point to a single transaction on which any of the four named plaintiffs were not paid. Well, you did. HP cut a couple checks and said one was a keystroke error, one was a, right? Yes. There were very small payments made because HP in its reconciliation process found that they had, they owed them in one case $273, in one case $942. Neither of those had anything to do with omega. That's undisputed. There was not a scintilla of evidence in the record that either of those errors had anything to do with omega. You know, I'm sympathetic on one level. It's a funny case. And I share some of the concerns raised by Judge Fletcher because on one hand, if you go way into the weeds, there's, I think, a great deal of support for HP's position in this case. But if I take a step back, the case seems kind of simple to me that plaintiffs are suing because they think their folks have been denied compensation, what they're owed under however HP was defining commissions, and really HP had all the cards. HP is the one who knows how they calculated commissions. Well, Your Honor, HP, as Judge Gould's question suggested, HP filed proper motions for summary judgment with respect to all four of the named plaintiffs. And Judge Breyer ruled, and plaintiffs hardly even contest the ruling, that there is no basis for any of the individual plaintiffs to say that they were not adequately paid. What they do to contest that is to say you didn't comply with request for production number 12 and give us the rest of the raw data by which we could have calculated the commissions. That's at least, counsel, how I understand them to be responding. We complied with request for production 12. They never complained about it. As they acknowledged here again today, the reason they never complained about it was because, as I said a moment ago in Judge – Magistrate Judge Zimmerman's September 2010 ruling, it was quite clear that he was limiting the discovery request to the request that deal with malfunctions related to Omega. We complied with that request. What they're looking for, as I understand it, and we have a – I should say, Your Honor, and it – and I think this is a fairly important – if you're plunging back into the record or the weeds, look at volume 2 of the record excerpts, in particular pages 182 to 208, and it's in – it's in that segment where Hewlett-Packard filed its objections to the discovery referee's discovery management order number 10, which was issued in May of 2011. Those objections were filed in June of 2011, and Judge Breyer then denied them as moot once he granted summary judgment. But if you look at those objections, you'll see that what they're talking about is data that is outside the Omega system that is then to be fed into the Omega system. It is not – The way you're going to figure out if the Omega system is working improperly so as not to pay people who are entitled to be paid is to figure out from the raw data, okay, what goes into this system, and if it comes out wrong, then you know that there's something wrong inside the system. So here's my problem with, in a sense, the definition that Judge Breyer seems to be employing, and I'm on page 22 of his last order, where they say the rulings limiting some access to raw data, specifically because those rulings construed the third amendment complaint as alleging Omega malfunctions.      So there's a lot of confusion here. But I think it's important to understand that the system that's HP has for the most  That's why the rules limiting some access to raw data. Roberts. I'm sorry. Could you tell me where you're reading from? I'm on page 22 of his opinion. Is that correct? I'm on the very bottom of page 22. Then I'm going to run over to the top of page 23. Okay. Thank you. If we're talking ER numbers, it's 23 and 24. Thank you, Your Honor. Okay. So I'm looking at the very last line or so on page 22. And then I'm about now to the top. HP has, for the most, I think you left out a word, for the most part, avoided having to turn over raw data regarding input from Omega. Thus, whether plaintiffs are entitled to the raw data folds back into the question whether plaintiffs should be granted leave to amend. I think I disagree with Judge Breyer. That is to say, anyone is entitled to discovery which will lead to admissible evidence. That is to say, the evidence itself doesn't have to be admissible. The evidence itself does not have to be directly relevant, but it can lead, something that can lead to relevant evidence. And I have great trouble seeing how raw data is so far outside what can lead to admissible evidence that will tell us whether the computer program is working, that they should be denied access to the raw data. Well, there are several responses to that, Your Honor. And I think you really do have to get into the details here. Well, we're trying. I think that there is, as we've said in our objections, there is no way that the raw data outside the system can identify as individual plaintiffs or talks about what they are entitled to. At most, what you would have would be invoices from other sellers to customers. Now, the relevant – Now, you say at most this is stuff you haven't supplied? I'm sorry, Your Honor? When you say at most this stuff, invoices and so on, the most it would show, are you referring to things that you have not handed over? We did not hand over what – if you look at the discovery management order number 10, you will see that the discovery referee was attempting to test out what he was ordering, so he ordered a sampling. And we have not turned that over because we objected to that, and those objections were pending. And Judge Breyer denied them as moot when he granted summary. Judge, you see, that's my problem with where we are. That is to say, it's possible that some of this raw data will tell us whether these people are not being paid properly. And Judge Breyer says, I don't want to see it because it's outside the system. Well, it may well be outside the system, but it may very well tell us whether the system is working properly. Well, Your Honor, I'm afraid that, you know, that's not accurate. And let me – let me – Why not? I have the same question, counsel. It's not accurate because the data is not related to these plaintiffs. So let me just step back for a second. These plaintiffs are – Are you saying you have no data that relates to these specific plaintiffs? We gave them all that data. That's the – that's the point. These people are coming into court and they're saying, we're here because we haven't been paid properly. Right. And we ask them, okay, what haven't you been paid? They were under an obligation on a monthly basis to check their own pay against the transactions for which they thought they should be paid. We asked all of them, please tell us what you say you should have been paid that you weren't paid. None of them had any answer. Read what Judge Breyer said, but also go back and look at their own depositions. They could not identify a single instance in which any of them hadn't been paid an amount that they said they should be paid, not one. But my understanding of the system, sir, is that they wouldn't have had that data. How would they have had that data? Your Honor, it's their own compensation. Only for direct sales that they made personally, right? Their sales, the sales of to customers for which they're responsible, whomever made those sales, the sales and territories for which they're responsible. Right. And at least one of the declarations or affidavits I read said, I wouldn't know that. I wouldn't have that information about sales within my sales territory. I'm not saying they're right. My question is, we're reviewing a summary judgment, and it seems to me there's a lot of unanswered questions about this very point that Judge Fletcher is raising. But, Your Honor, it is not appropriate. Think about the – take it out of the context of this case for just a moment. It's not appropriate in general for a plaintiff to come into court and say, I don't think I've been paid properly. I don't know that that's true, but I don't think I've been paid properly. Now, defendant, please give me millions of documents. Well, they had more than that. The record shows that there are – there's internal emails indicating that HP thought there might be a problem, too. That there were some problems with the processing of pay. But there was no – they have come up with – we did not stop any discovery on Omega. We gave them whatever we had on Omega. They had no evidence that an Omega glitch or the Omega software failed to pay them. You know, I would be more sympathetic to what you say if there were not a record here of HP resisting, resisting, and resisting discovery at every turn. Well, Your Honor, I beg to differ. No, you can. Go ahead. But there's a record here that you've not been very cooperative. We produced over 335,000 pages of documents, Your Honor. But the discovery master or magistrate made the finding that Judge Fletcher is referencing. Right. If – I think if you look at all the discovery management orders and you add them up, there are some orders – there are some rulings and some orders in which he rules in favor of Hewlett-Packard. There are some rulings in which he rules in favor of the plaintiffs. There are a total of ten of them dealing with a wide variety of different discovery requests. I'm not sure you answered my question and time is short. Aren't there a couple of findings? Or am I mistaken? Aren't there a couple of findings that HP had delayed unreasonably, was not cooperating with the discovery, dragging its feet, something like that? Didn't I read that? Yes, with respect to a very narrow subset of documents which were produced. Okay. So, counsel, it's Judge Gould. Could I interject one – just a couple of questions? As I understand it, there was an order to produce more or whatever was required under RFP 12, and that the company then made a production to a certain extent and objected to going beyond that because of the way they read the master's order. Right so far? I think you're right so far, Your Honor. Okay. Now, at that point, and now I'm sort of going back to my thinking back to practice years, so I could be wrong in this, but if at that point you had tendered a certain segment of documents in response to RFP 12 and had objected to going farther, couldn't the plaintiffs have gone back to the discovery master who issued that order or gone to the district court and said, hey, the compliance – there's not full sanction P. But that wasn't done, right? As I understand it, and tell me if I'm wrong in this, HP made a production to a certain extent on that RFP and then objected, and that answer, objection, wasn't taken back in the system with another challenge. Your Honor, you are right, and to some – to a great extent, and there's one small way in which the plaintiffs actually did go back. And the earlier question was whether they had taken the matter up with Judge Breyer. Well, the reason for a discovery management order number three, which was issued by the discovery referee in January of 2011, is because the plaintiffs went to the discovery referee and said, you know, I think Hewlett Packard has been forthcoming enough in responding, and that's when the discovery referee said he was rejecting their construction of the request, he was limiting it to omega, contrary to what the plaintiffs were arguing. That's in the excerpts of record at pages 78 to 93. We were looking at that earlier. But then they never appealed from that, and they never raised it again with the district court, and that's what counsel just acknowledged earlier in the argument today. Not only that, but when they asked for additional time, our motions for summary judgment were filed on February 4, 2011. They came in right away and they said we need additional time. They never said a word about needing more documents. That was not their – that was not their explanation. It was only two months thereafter, when they wanted yet another extension, that they started talking about the raw data. And they didn't file their Rule 56d affidavit. They didn't say explicitly what facts they were looking for. They didn't say what – that those facts exist. They didn't say how they would help them oppose the summary judgment motions, all of which is required by the rule. They did none of that. They just asked for more time. And now they say, well, you know, they don't challenge the summary judgment based on the record that they have. They don't challenge the summary judgment based on their own employment time when they were supposed to be keeping track of their own compensation. To the extent that they point to anything, there – as the earlier question suggested, there are these two small payments to two plaintiffs that were made by Hewlett Packard. They don't claim that they were inadequate. To the extent that Mr. Johnson says that he thought he should have gotten a – some sort of credit for a sale to the Hackensack Medical Center, he – he acknowledges that that sale did not reach the threshold for a so-called manual claim. So he was properly denied credit for that. But, counsel, I think your response is really helping me. Your response to Judge Gould's question, because it seems to fold back into the question posed by Judge Fletcher, which is, it only works to complain that they didn't take up an appeal of DSM – or, sorry, DM-03 if – if that definition by the discovery master is the way – read the way you want us to read it, as opposed to the way Judge Fletcher maybe was suggesting the discovery master had used the word system. Well, you can only understand, I would suggest, Your Honor, you can only understand the order in the context of the dispute that led to the order. When the parties came before the discovery master and they argued, what they were arguing about was just this point, whether RFP-12 initially served back in February 2010 and then ruled on by Magistrate Judge Zimmerman in his order of September 2010, whether that went beyond Omega. But they think they won. They think that they got a ruling out of the Order No. 3 that defined Omega more broadly than you think the master defined it, right? Well, Your Honor, I mean, all I can say is that the master himself said that he was accepting the Hewlett-Packard position. He says the reference – first, he sets up what the plaintiffs were arguing. If you look at the bottom of Record Excerpts 81, he says they argue that their pleading contemplates that Omega is merely being a part of some more expansive structure known broadly as HP's compensation system. Right. Thus, they conclude discovery requests directed to something beyond Omega are proper and understandable. The referee does not agree. Right. And then it goes over to page 82, and that takes us right back to the few sentences that we read earlier in the argument today, where Judge Fletcher pointed out that he's using the word system, right? Yes, Your Honor, but look at the end of the sentence. It says, And not to an ecosystem of which Omega is merely a part. I wish ecosystem were a technical term that I could understand. Obviously, Judge Warren is saying that Omega, under his definition, is more than a simple program for calculating. It is a system. Now, how broad system is and where the line is between system and ecosystem, I've always had trouble. Okay. But here's a related point. Using this definition that Judge Warren has given us as the special discovery master, he has ordered the production of raw data, correct? Oh, no, Your Honor. That was a completely separate order. That was DMO number 10. That went well beyond DMO number 3. That's why Hewlett-Packard objected to it. But he ordered it to respond to the question, and you objected, and you think those objections were deemed moot at the time the summary judgment was announced. Absolutely. The sequence of events is as follows. We filed a motion for summary judgment in February 2011. The plaintiffs opposed the motion for summary judgment in April of 2011. The DMO number 10 was not issued by the discovery referee until May of 2011. We filed our objections to it in June of 2011, and then those objections were deemed moot by the district court when the district court granted summary judgment. But my point is that the meaning of the definition to Judge Warren, who is himself giving us the definition, permits discovery of the raw data. Correct? No, I don't think that's it. Isn't that how he read it? No. I think if you read ñ when you go back and you look at DMO 10, plaintiffs were admittedly trying to go beyond what he had previously ordered. And he was reluctant to grant their request, but he wanted to give them something. So he said, well, let's do a sampling of six-month periods with respect to two or three, I can't remember, of the plaintiffs. So I thinkó And have you had any ruling as to whether or not there's a proper objection to the scope of that one? I'm sorry, Your Honor? You object. You say that that scope ñ the scope of that order is too broad. Correct? We filed objections with the district court, yes. And you've not had a ruling on that. Correct? Those objections were denied as moot. So the answer is yes. Right. In other words, it seems to me entirely possible that Judge Warren, as he understood his own definition, thought that raw data was discoverable. At the very least, we don't know the answer to that question. Well, all right. In any event, the district court hasn't ruled on that subject becauseó But I'm ñ at the moment, I'm only narrowing. I'm trying to figure out what Judge Warren meant by the definition. And he seems to me to have given a discovery order that, based upon our understanding this definition, that is an order that says produce raw data. Now, that may be wrong if the district judge were to rule on it, but I'm just trying to figure out what Judge Warren meant. Well, for another signpost of what he meant, Your Honor, is Discovery Management Order No. 6, which was issued in March of 2011. That's in the excerpts of record at pages 49 to 71. If you look at page 50, note 2, he goes into the question of what is and isn't omega. He summarizes his own Discovery Management Order No. 3, and he points out that the plaintiffs have not appealed. So it's clear that Judge ñ if you look at that sequence, it's clear that Judge Warren believed he was ruling in favor of Hewlett-Packard, not in favor of plaintiffs, and he points out in Order No. 6 that the plaintiffs haven't appealed. Well, it really does beg the question of what he meant in Order No. 3, but you objected to it. You thought it was too broad. No, no, Your Honor. We objected to Order No. 10. Exactly, counsel. Right. But that wasn't an order interpreting Order No. 3. It's an order requiring the sampling, right? What's the basis of your objection to Order No. 10? Yes, we did. Those were the ñ that's the pages 182 to 206 or 208 that I mentioned. Right. I think we understand each other. I think we disagree on this point, but I think we understand each other. Okay. Well, we've taken you only 15 minutes over. Thank you. Your Honor, I would just like to say, if I might, because I haven't said this, I think what Judge Gould asked a little while ago when my colleague was arguing is important here. This is a case, and as Judge Fletcher, one of your questions, acknowledged at the beginning, this is a case in which the plaintiffs are basically here asking this Court to inject itself into a year and a half or two years' worth of litigation in which both the magistrate judge and the discovery referee assisted the district court, and Judge Breyer himself got deeply into this. And the rulings on the motion to amend, the rulings on taking additional discovery before responding to summary judgment motions, those things are committed to the sound discretion of the district court. And that discretion was exercised here for good and sufficient reasons by the people who were closest to the litigation, the ones who knew what had gone on. And I submit to the Court that that ought to be given considerable respect. Thank you. Roberts. Response. Obviously, we're going over time, so why don't we put 5 minutes on the clock and see what happens. Thank you, Your Honor. Given how long we have gone, I'll try to keep these points brief. But I think as a threshold matter, you're seeing some of what the difficulties have been here today. Omega and definition of omega tends to both swallow the discussion and sidetrack the discussion. The key issue for this appeal is, at least I believe in looking at the briefing, the key issue is was Judge Breyer correct when he denied plaintiffs' request for a The underlying raw data is not about the omega system. It's about what the plaintiffs should have been paid for. HP and the Court, in fact, in the third page of the record, the second page of Judge Breyer's opinion, he begins by saying, HP might have underpaid and or unpaid late some of its sales representatives. However, plaintiffs lack sufficient evidence to create a tribal issue. I'm sorry. What page are you on? Record page 3. Record page 3. And where are you on that page? The very first paragraph. Okay. There you go. Okay. Plaintiffs lack sufficient evidence to create a tribal issue as to whether they were underpaid or late. That evidence is the – could only be taken from the damages request. That is, could only be discovered if plaintiffs received the upfront raw sales data to show that what was in the credited transaction report that HP chose to produce, that is, the evidence of here's what we paid them, lines up with what they should have been credited for. And what basis do you have to believe or strongly suspect that the raw data that you have requested will provide the information you're hoping to get? I believe there's a number of bases for that. However, one of the key points is that each plaintiff in deposition, and in fact, in some of the – some of HP's own employees had stated these plaintiffs were complaining about not being paid right. They could not point to an exact transaction, and why is that? And that, I think, is one of the issues that came up during the response. Omega, this complex system, was down much of the time. And plaintiffs, as employees, did not have access to Omega to see all this incoming data that they're supposed to be paid for. Rather – and I – unfortunately, I cannot give you the record page right now, but in the record, something called Omega Online is discussed, which provides a snapshot. It provides them, here's the information you've been credited for. Again, it's on the back end of the equation. And that wouldn't be – Now, help me – help me understand as a practical matter. I mean, Mr. Buscemi is suggesting to me that the employees knew what they did and what they should have been credited for. And if they can't tell us, well, then it's not there. So tell me as a practical matter why you think that these plaintiffs wouldn't know and wouldn't be able to provide the information upon which they would have been paid. Well, first of all, they're having to look a number of years into the past to try to remember thousands upon thousands of transactions that would have been included in their ever-shifting sales letters. In other words, what they were supposed to be paid for, that changed every year, every single year. And in those sales letters designating those payment areas, some of those they were not directly involved in. It would have been a partner selling outside that they should have received credit for. I see. So they get a little – to use a bad term, they get a little bit of a kickback from somebody else. They get a percentage, I'll say it that way, of somebody else's sales if somehow they're – they contributed in some – I got it.  Yes. Did they – opposing counsel did make those points, and I think it's important one. If I'm wrong, I want to be corrected. My understanding from one of the declarations somewhere in the record is that individual salespeople didn't necessarily have direct knowledge of other sales to which they would have been entitled to commissions within their region for which they were responsible, for example. Is that right? It's correct that they wouldn't have direct knowledge, yes, because of the way the system works, there's no way they could possibly know every single thing. Well, I'm talking about personal knowledge. I'm not talking about going to Omega Online. I'm talking about personal knowledge. Right. Personal. Correct. Right. So if it's not – if the data hadn't been fed into Omega in – the Omega system that I'm struggling to understand how Omega Online would have allowed them to be on notice that something's not credited. The – I mean, they either have personal knowledge of the sale or not. They wouldn't. Right. And that's where the issue would have come from, that Omega Online would not have provided them that knowledge. Okay. So here's my problem, and I haven't been subtle about this, and it wasn't the first time you were at the podium, which is that, you know, the district court is not a mind reader. And much of what we're talking about regarding requests for production number 12 and your view of what that ruling was, it sounds like, you know, I understand your argument, but you didn't tell Judge Breyer that at the time of the summary judgment motion. So if I read the second discovery order differently than you read it, if I read it to be truly contingent upon the acceptance of the fourth amended complaint, that is, you're not entitled to this unless the judge permits you to amend the complaint one more time, if that's right, what have you got to keep the summary judgment? The summary judgment. And I think the briefs do speak to it, but I think the primary issue with regard to summary judgment, assuming that reading of the order, is we put forward a number or we put forward evidence showing HP knew that its employees had pay issues. It might not have been able to point to each identifiable one. We did not have evidence of each identifiable one from raw data, but we did know of certain payments that even HP discovered weren't correct to their plaintiffs, their payments. On summary judgment, and we're all familiar with the basic standard, that the nonmoving party should be given the benefit of doubt. And here, that, quite frankly, didn't happen. The evidence where you said we knew of some, are you talking about the two very small checks that I mentioned that they cut? He's right. They cut them and sent them to your client. We know of those. What we never saw was how they got to those. We never saw the underlying data that HP chose to look at to get to that determination of, oh, this one was paid wrong. We don't know if they looked at the whole universe or if they didn't. In their objections to DM-010, although they think it's difficult to comply with, they actually try to come up with a structure where they would look at some of this information, some of the raw data, to produce that. And I believe the exact phrase is, this list would be either under-inclusive or over-inclusive of, in this particular objection, Johnson's sales history. The issue really comes back to, though, was their damages. The entire order, throughout the entire order dismissing this case, points to whether plaintiffs were underpaid or late, saying that we didn't have the evidence of that, and we didn't because HP refused to turn that over. Okay. So when you're in front of Judge Breyer this last time around, what are you saying with respect to, we do not have enough information, we need this discovery to be ordered to be fulfilled before we can get an appropriate ruling on summary name plaintiffs? Because he says there's not enough evidence, and he also says, I'm not going to allow a minimum of the complaint. And what did you told him? And maybe you can send me to the record in terms of what notice did you put him on, wait a minute, we've got an outstanding discovery order here that will tell us the information or has a very good chance of giving us the information to tell us that these named plaintiffs have been underpaid. I do believe the briefing touches on it, but I do think the best place to look. That sounds like a very weaselly word. The other side says all you did was ask for extensions. Well, I contest that all we needed was additional extensions, but I. But extension for what purpose? Extension to get that discovery, to see what it said, and to make the comparison. Well, I guess I'd just better read your briefing in the district court, because I don't have it, I do not have it firmly in mind as to precisely what you said to Judge Well, there's two things I'd like to point to. One of them, and it responds in part to the affidavit argument. Mr. Barkley's affidavit was cited within the briefing. However, by some error, it was not filed with the district court. However, the information about what we thought it would show was there, not only in argument, but in the named plaintiff's affidavits, they state that if they were to point out a number of transactions for which they were not properly paid. And I know for certain that is in Ms. Reese's affidavit, and I'm certain it's in the others as well. And as an example, I'll point you to Volume 5 of the record, 807 through 808, Paragraph 7, where Ms. Reese points out, if I was given this data, I could look at it and tell you I was not properly paid for this information. And what kind of a document are you reading from? Was this presented to Judge Breyer at the end? That was part of it. I'm sorry. Was this document presented to Judge Breyer as we were arguing this last motion? I don't know if it was presented in court. I know it was presented as part of the briefing. And I also know that at the very end of the argument, one of the last things that was actually the last thing that was said to Judge Breyer was this whole idea of input versus output. We need to see what was they were supposed to be paid for. And in essence, it is a very easy case. Omega can be very complex, but we're pointing to an error that HP admitted existed, and we're saying we weren't paid right. We knew we weren't paid right throughout. Let's get that data. And the last point I want to bring out is that in seeking that damages information, we can't forget the context of the case. It was a class action case. We were looking for information to certify that class, not the individual damages information at the end. In fact, HP had argued early on, we shouldn't get to damages discovery until maybe after the class is certified. What's wrong with that? What's wrong with HP bringing a summary judgment motion whenever they wanted to? There's nothing wrong with them bringing it when they wanted to, but they – but the Court, quite frankly, hung its hat on us not being able to prove damages. That information was information HP refused to disclose and didn't want to disclose until after certification. I appreciate that, but I think I am missing something, because you've said several times here today that this was about class action. We were trying to get certified. Well, that's what you're trying to do. That's not what they're trying to do. Right. They're trying to beat you at summary judgment. Right. And I don't – and to go back to Judge Gould's question, I don't see anything wrong with that. There wasn't a pretrial order that they violated anyway that set a deadline that they missed. I mean, they were free to bring a motion when they wanted to.  Yes. They were free to bring the motion at the time they chose, but they had to – they were going to be stuck with whatever facts existed at that time to the point that – and that's why I said 56 contains that subsection D, that savings clause. If there is evidence that is necessary to respond, plaintiffs were entitled to that additional time to see that evidence. Okay. And that brings me to my very last question, because we've been asking you this all day. So what did you tell Judge Beyer? Because he's not a mind reader. And you've told me to go look at Ms. Reese's affidavit again, which I know I've read, but I'll read it again. Is there any place else I should look to tell me what you told Judge Beyer when he was getting ready to rule on that summary judgment motion to the effect of hold it? You know, we don't have what we need yet. We've asked for it. They haven't complied. What did Judge Beyer have? Anything else? I would point you to all four named plaintiffs' affidavits. I gave you the record of citation for one. Okay. But I would also point you to the argument on point where Mr. Barkley did, in fact, mention the input versus output issues. Those are, I think those are your, some of the key points that show we need to know what went into it so we know whether what came out of it was correct. Okay. Thank you. Thank you very much. Well, thank you very much, both sides. Sorry to keep you so long. I think we're a little better educated than when we came in. I hope so. The case of Hansen v. Hewlett-Packard has now submitted for decision, and we're in adjournment for the day. Thank you. Thank you.
judges: Fletcher, Gould, Christen